UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| ELIZABETH CADY STANTON TRUST,<br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>PETER NERONHA, ATTORNEY<br>GENERAL, STATE OF RHODE ISLAND,<br>　　　　　　Defendant. | )<br>)<br>)<br>)<br>) No. 1:22-cv-00245-MSM-LDA<br>)<br>)<br>)<br>)<br>) |

MEMORANDUM & ORDER

Mary S. McElroy, United States District Judge.

## I.　　INTRODUCTION

On July 9, 1848, centered around a visit by noted suffragette and abolitionist Lucretia Mott, the first reported women's rights convention opened in Seneca Falls, New York. Among the Quaker organizers, although not a Quaker herself, was Elizabeth Cady Stanton.

> Standing before a crowd packed into Wesleyan Chapel in Seneca Falls, New York, thirty-two-year-old Elizabeth Cady Stanton proclaimed: "We hold these truths to be self-evident: That all men and women are created equal." The intent of her statement was clear – to give new meaning to Jefferson's often-quoted phrase from the Declaration of Independence. For the first time in an organized public setting, women found their voices and directed their attention to the injustices that for centuries had defined and circumscribed their lives. Here, a group of women was insisting that they were men's equal. This was a momentous assertion, a momentous event. The July 1848 Seneca Falls Convention and its declaration of Rights and Sentiments formally initiated the struggle for women's equality and justice.

1

Sally McMillen, Seneca Falls and the Origins of the Women's Movement 71 (2008). It was not until 1923, 100 years ago, that the Lucretia Mott Amendment, enshrining Stanton's declaration in what would ultimately be called the Equal Rights Amendment ("ERA"), was introduced in Congress.[1]  Judiciary committees of both chambers held hearings in every year after 1923, but it took until 1970 for the proposal to make it to the House Floor.  By a vote of 352 to 15, the body proposed its ratification as the Twenty-seventh[2] Amendment to the United States Constitution. *Illinois v. Ferriero,* 60 F.4th 704, 711-12 (D.C. Cir. 2023).  The Senate, however, did not take it up and it lapsed.  Two years later, both chambers passed the resolution proposing the Amendment for ratification and submitted it to the 50 states. Contained within the resolution, although not the text of the ERA, was a seven-year deadline within which two-thirds of the states, 38 of them, were required to vote affirmatively for the Amendment to be ratified.  *Id.* at 712.

As of 1982 only 35 states had voted to ratify, even though the deadline had been extended by three years.[3]  For the next 30 years, the ERA was presumably

---

[1] The ERA was conceived at a women's rights meeting celebrating the passage in 1920 of the Nineteenth Amendment giving women suffrage.  Congressional Research Service, The Proposed Equal Rights Amendment: Contemporary Ratification Issues (Dec. 23. 2019), https://crsreports.congress.gov/product/pdf/R/R4297.

[2] Had the ERA been ratified immediately, it might have been the Twenty-seventh Amendment.  In 1992, however, an amendment affecting the compensation of members of Congress was ratified as the Twenty-seventh.  Thus, the current effort is to make the ERA the Twenty-eighth Amendment to the Constitution.

[3] The original deadline passed in 1979, but in 1978 Congress extended it for three years.  The authority of Congress to extend the deadline was challenged, but before the United States Supreme Court could take up the matter, the extended deadline

considered dead, but in 2018, Nevada ratified it, followed quickly by Illinois and Virginia. *Id.* at 713. Since then, a battle to accord vitality and validity to the ERA has been fought on dual fronts. In one arena, twenty Attorneys General wrote to the leadership in both Congressional chambers on February 22, 2020, urging them to bring to the floor two bipartisan resolutions removing the deadline for ratification. (ECF No. 5 at 18-21, Exh. A). Among the signatories, which included Attorneys General from all six New England states, was the defendant, Peter F. Neronha, Attorney General of the State of Rhode Island.[4] In April 2023, a Senate vote to validate the ERA failed, gaining only 51 of the necessary 60 votes. Katharine Jackson, <u>US Equal Rights Amendment Blocked Again, a Century After Introduction</u>, US News (Apr. 27, 2023, 6:02 AM), https://www.usnews.com/news/top-news/articles/2023-04-27/us-senate-to-vote-on-equal-rights-amendment-a-century-after-introduction.

The second arena, the location of this dispute, is in the courts. The instant complaint is brought by the advocacy organization, the Elizabeth Cady Stanton Trust ("Trust"), a "national 501(c)(3) organization whose mission includes education and advocacy for women's constitutional equality and rights." (ECF No. 1, ¶ 9.) Employing several different legal strategies, the Trust and other proponents of the

---

had passed without additional states voting in favor, and the case was dismissed as moot. *Illinois v. Ferriero,* 60 F.4th 704, 712-13 (D.C. Cir. 2023). To further complicate the situation, four states were attempting to rescind their previous affirmative votes. *Id.* at 712.

[4] This letter is cited for historical background.

ERA have filed actions in at least six courts, including this one.[5] In this action, as in several others, the Trust requests a declaration that the ERA is a valid Amendment to the Constitution; based on that proposition, it seeks a Writ of Mandamus to require the Attorney General to undertake a comprehensive review of "all sex discriminatory laws, policies and programs in Rhode Island, and bring them into full compliance with the ERA." *Id.* ¶ 7. In some cases, it has sued the Archivist of the United States ("Archivist") seeking to require him to publish and certify the ERA as a valid part of the Constitution.[6]

In *Equal Means Equal v. Ferriero,* 3 F.4th 24, 26 (1st Cir. 2021), advocacy groups sued the Archivist. In *Virginia v. Ferriero,* 525 F. Supp. 3d 36, 40 (D.C. 2021) and *Illinois v. Ferreiro,* 60 F.4th 704, 713 (D.C. Cir. 2023), two of the three states which had recently ratified the ERA sued the Archivist to recognize their post-deadline ratifications as valid. And in the posture most like this one, the Trust sued

---

[5] *See Illinois v. Ferreiro,* 60 F.4th 704, 709 (D.C. Cir. 2023); *Elizabeth Cady Stanton Trust v. Nessel,* No. 22-000066-MB, 2023 WL 3259399, at *1 (Mich. Ct. Cl. Apr. 12, 2023); *Elizabeth Cady Stanton Trust v. James,* N.Y. Sup. Ct., Albany County, June 26, 2023, Hartman, J., Index No. 903819-22; *Equal Means Equal v. Ferriero,* 3 F.4th 24, 26 (1st Cir. 2021); *Virginia v. Ferriero,* 525 F. Supp. 3d 36, 40 (D. D.C. 2021).
  These are by no means the only litigated cases involving the ERA, but simply the cluster of the most recent cases asserting that the Amendment was in fact duly ratified. In previous years there was litigation trying to stop the ratification effort. *E.g., State of Idaho v. Freeman,* 626 F.2d 886, 887 (9th Cir. 1980) (Idaho and Arizona action against Administrator of the General Services Administration ("GSA") which had the responsibility for certifying ratification).

[6] In 1818, because there was no method for publicizing state action on proposed constitutional changes, the President designated the Secretary of State to be responsible for publishing ratification approval and rejection by the various states and for certifying when a proposed amendment had been validly ratified. In 1951 the authority was transferred to the GSA and in 1984 it was transferred to the Archivist where it remains. *Illinois v. Ferriero*, 60 F.4th at 711-12.

the Attorneys General of Michigan and of New York to carry out the ERA. *Elizabeth Cady Stanton Trust v. Nessel,* No. 22-000066-MB, 2023 WL 3259399, at *1 (Mich. Ct. Cl. Apr. 12, 2023); *Elizabeth Cady Stanton Trust v. James,* N.Y. Sup. Ct., Albany County, June 26, 2023, Hartman, J., Index No. 903819-22 (hereafter "James").

The Michigan and New York actions are virtually identical to this one, pursuing a declaration that the ERA is "valid and enforceable, as well as a writ of mandamus to compel defendant 'to identify and repair all sex discriminatory laws, policies and programs in [the state], to bring them into compliance with the ERA.'" *Nessel,* 2023 WL 3259399, at *1. *Compare* ECF No. 1-1 at 1, Complaint[7] and *James,* Complaint, at 1.[8]

## II. JURISDICTION AND STANDARD OF REVIEW

The Trust filed its action in the Rhode Island Superior Court. The defendant ("Attorney General" or "State") removed it to this Court. (ECF No. 3, at 5.) Jurisdiction presumes a federal question arising under the laws of the United States. 28 U.S.C. § 1331. Declaratory relief pursuant to 28 U.S.C. § 2201(a) is available in

---

[7] "This is an action for declaratory judgment . . . to obtain a judicial declaration that the Equal Rights Amendment ("ERA") is valid and enforceable. Plaintiff also seeks mandamus relief in the form of a court order requiring Defendant to identify and repair all sex discriminatory laws, policies, and programs in Rhode Island, to bring them into compliance with the ERA . . . ." (ECF No. 1-1, at 1.)

[8] There is no published decision in *James,* although the case was dismissed by written Order on June 26, 2023. *James,* N.Y. Sup. Ct., Albany County, June 26, 2023, Hartman, J., Index No. 903819-22. The Complaint is available as a public document and this Court has taken judicial notice of its language, which is identical to that in *Nessel.* There is no activity recorded in the docket of the Supreme Court of New York at Albany since the decision.

the federal courts in cases of "actual controversy", which includes the need for ripeness, "a sine qua non of any assumption of federal jurisdiction." *Verizon New England, Inc. v. Intern'l Broth. of Elec. Workers,* 651 F.3d 176, 188 (1st Cir. 2011). Ripeness is generally a question of law. *Ernst & Young v. Depositors Econ. Prot. Corp.,* 45 F.3d 530, 534 (1st Cir. 1995). Mandamus was sought in the Superior Court pursuant to R.I.G.L. 1956 § 8-2-16.

The Attorney General has moved to dismiss. (ECF No. 5.) In deciding a Motion to Dismiss, the Court's methodology and scope of review is familiar. The Court must assume the truth of all "well-pleaded facts and give the plaintiff the benefit of all reasonable inferences therefrom." *Thomas v. Rhode Island,* 542 F.3d 944, 948 (1st Cir. 2008). The plaintiff must demonstrate that its claim for relief is "plausible." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

### III. MOTION TO DISMISS

The State puts forth several arguments in support of its Motion to Dismiss. Two have found purchase in this Court, obviating the need to address anything else. First, the State protests that the Trust lacks Article III standing, and the Court agrees. Second, the State objects to mandamus because, *inter alia,* the Trust fails to show that what it seeks from the Attorney General is performance of a ministerial duty. The Court agrees with this proposition as well.

#### A. Standing

"[J]ust like suits for every other type of remedy, declaratory-judgment actions must satisfy Article III's case-or-controversy requirement." *California v. Texas,* ___

U.S. \_\_\_, 141 S. Ct. 2104, 2115 (2021). To demonstrate that it has standing, a plaintiff must allege (1) an injury in fact, (2) that is traceable to the defendant's conduct, and (3) is redressable by judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). An organizational plaintiff may establish Article III standing in either of two ways: by showing (1) the organization, in its own right, has suffered an injury and meets general standing criteria ("organizational standing") or (2) the organization represents a member who would have standing on their own ("member standing"). *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, \_\_\_ U.S. \_\_\_\_, 143 S. Ct. 2141, 2157 (2023).

    The Trust's position on standing is, frankly, unclear. There is no claim of member standing here. A claim of member standing requires a showing that the organization has members and that one or more of those members have suffered injuries in fact. This Complaint was brought purely on behalf of the Trust, although it asserts that "Plaintiff and all women have standing." (ECF No. 1, ¶ 18.) The Complaint does not describe the Trust as being a member organization. (ECF No. 1, ¶ 9.) The Trust has not identified one single member, or individual, who has suffered an injury from the failure of ratification. Instead, it presents a series of statistics on violence against women which, while distressing and alarming, does not satisfy the requirement of injury in fact. (ECF No. 1, ¶ 22-28.) *Equal Means Equal,* 3 F.4th at 29 (no causal connection between statistics on violence against women and failure to recognize ERA validity).

7

Having failed to plead a case for member standing, the Trust's Reply Memorandum disavows organizational standing. "[T]he standing argument in [*Equal Means Equal]* was exclusively based on organizational standing, *a theory not asserted here.*" (ECF No. 16, at 5) (emphasis supplied). The Trust's memorandum contends there is a "third" type of standing, exemplified by the case of *Idaho v. Freeman,* 507 F. Supp. 706 (D. Idaho 1981). The Trust insists that *Freeman* "is the only case on point and is the only theory of standing asserted by Plaintiff in this case." (ECF No. 16, at 5.) But *Freeman* did not address organizational standing to bring a cause of action: it granted intervenor status to the National Organization of Women in an ERA-related case[9] and, particularly because there is controlling precedent in the First Circuit, the Court rejects any "third" type of standing in a case brought by an organization.[10] Despite the Plaintiff's disavowal, the Court addresses at some length organizational standing below. It notes, however, that the elements on which

---

[9] *Idaho v. Freeman,* 507 F. Supp. 706, 712 (D. Idaho 1981).

[10] In a "Look, we are on the same side" argument to rebut justiciability, the State also protests that there is no controversy because it agrees with the position of the plaintiff that "the ERA should be part of the United States Constitution." (ECF No. 5, at 11.) *See* ECF No. 5, at Exhibit A (letter signed by defendant Neronha and 19 other Attorneys General attempting to convince Congress to eliminate the deadline for ratification). When determining whether there is an "actual controversy" present the court must consider "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941). The New York Court found this argument convincing. *James,* at 10. This Court finds it interesting but need not reach whether it is conclusive because of the failure to meet other standing requirements.

organizational standing fails (concrete injury and causality) are common to all theories of standing.

An "injury in fact" means a concrete and particularized invasion of a legally protected interest. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). It must exist. *Spokeo,* 578 U.S. at 340. A controversy is not justiciable if based on hypothetical future injuries that have not yet arisen. *Texas v. United States*, 523 U.S. 296, 300 (1998). Generalized harm, as the Trust alleges is occurring to all women from the failure to acknowledge ratification of the ERA, is not sufficient. *Laufer v. Acheson Hotels, LLC,* 50 F.4th 259, 275-76 (1st Cir. 2022). "Injuries that are too 'widely shared' or are 'comparable to the common concern for obedience to the law'" are not sufficiently particularized. *Id.* at 275 (quoting *Lyman v. Baker,* 954 F.3d 351, 361 (1st Cir. 2020)). The injury to the plaintiff must be "different from the citizenry at large . . .." *Nessel,* 2023 WL 3259399, at *2. "When a plaintiff's interests mirror those of the general public, however, the plaintiff does not have standing." *Id.*

While the Trust claims standing under the criteria of *Idaho v. Freeman,* 625 F.2d 886, 887 (9th Cir. 1980), the Court finds far more apt the First Circuit's discussion in *Equal Means Equal.*[11] The Trust is an organization very similar in relevant aspects to Equal Means Equal and The Yellow Roses, the co-plaintiffs in that

---

[11] The New York Supreme Court similarly rejected the Trust's reliance on *Idaho v. Freeman. James,* at 7. It is significant that *Freeman* was a 270-word opinion devoid of analysis, declaring that "NOW has [such] an [intervenor] interest in the continued vitality of ERA, which would as a practical matter be significantly impaired by an adverse decision and which is incompletely represented here." *Freeman,* 625 F.2d at 887.

9

action. All argued that their mission is impeded by the failure to recognize the ERA because of the diversion of the resources they need to expend to fight for women's equality so long as the ERA is not recognized as law.

As the First Circuit explained,

> an organization cannot establish standing if the "only injury arises from the effect of [a challenged action] on the organizations' lobbying activities, or when the service impaired is pure issue-advocacy." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093-94 (D.C. Cir. 2015) (citations and internal quotation marks omitted). "Otherwise, the implication would be that any individual or organization wishing to be involved in a lawsuit could create a[n organization] for the purpose of conferring standing, or could adopt [a mission] so that the [organization] expressed an interest in the subject matter of the case, and then spend its way into having standing."

*Equal Means Equal*, 3 F.4th at 30. The Trust argues that failure to recognize the ERA denies its members "the benefits of equality," and forces them to "suffer from sex discriminatory laws and policies . . ." (ECF No. 9, at 8.) The causal link, however, between the failure to enforce the terms of the ERA and the harm women may face is speculative and attenuated. The Trust argues that the failure to recognize the ERA means that gender is not a suspect classification and, therefore, that assaults on women will not be as vigorously combatted as hate crimes, which in turn will result in higher rates of violence. (ECF No. 9, at 9.) But causality is not sufficiently pled "[when] the plaintiffs are seeking relief from the conduct of a defendant who stands well removed from the person who would directly inflict that harm." *Equal Means Equal,* 3 F.4th at 28. The relief sought from the Attorney General is "well removed" from the actions of those whose violent acts or discriminatory conduct might be

mitigated by adoption of the ERA. That harm itself is speculative. "Plaintiff's claim rests on hypothetical and contingent future events that may or may not occur." *Nessel,* 2023 WL 3259399, at *3. *Equal Means Equal* is precedent virtually on point.

In both Michigan and New York, the Trust was found to lack standing in bringing actions identical to this one. "[The] plaintiff has not shown, or even argued, that should the Attorney General not take the requested action plaintiff would, or might, sustain an injury that is in any matter different from the general public." *Nessel,* 2023 WL 3259399, at *2. Nothing about this case calls for a different result than that reached in *Equal Means Equal, Nessel,* and *James.* The Trust has not demonstrated Article III standing sufficient to sustain its claim for declaratory relief.

### B. Mandamus Relief

The claim for mandamus relief must fail as well for another reason. Mandamus is an extraordinary remedy, *Kerr v. United States Dist. Court for N. Dist. Cal.,* 426 U.S. 394, 403 (1976), and the requirements for its proper issuance are rigorous. The plaintiff must show: (1) a clear legal right to the relief sought, (2) a ministerial duty the defendant is required to perform, and (3) that there is no adequate remedy at law. *Heckler v. Ringer*, 466 U.S. 602, 616 (1984). The Trust fails to meet both the clear entitlement and the ministerial duty criteria.

The Trust proposes that the Attorney General embark on a far-reaching search without boundaries "to identify and repair all sex discriminatory laws, policies, and programs in Rhode Island, to bring them into compliance with the ERA." (ECF No.

1, ¶ 1.)[12] This request for relief on its face fails to specify anything that the Trust has a "clear right" to, nor does it describe ministerial duties. The Trust seeks to require the Attorney General to "identify and repair" all laws, policies, and programs in Rhode Island to bring them into compliance with the ERA. It would compel the Attorney General to be a kind of roving ombudsman for women's equality, ferreting out potential inequities in the law and "fixing" them.

The Attorney General is a constitutional officer. R.I. Const. art. IV, § 1. The duties of the office are not spelled out in the Constitution but are "the same under this Constitution as are now established, or as from time to time may be prescribed by law." R.I. Const. art. IX, § 12. To the extent that "repair . . . laws" means to fix or rewrite them, that is a power reserved exclusively to the General Assembly. R.I. Const. art. VI, § 1. To the extent that "repair . . . policies and programs," implies

---

[12] The Trust presents a laundry list of laws that it suggests do not comply with the ERA, *e.g.*, (1) R.I.G.L. 1956 § 9-25-17, which states "No execution shall issue against the body of any female on any judgment founded on a contract where the debt or damages do not exceed fifty dollars ($50.00); but in such case, the execution shall issue against the goods and chattels and real estate of the female against whom the judgment shall have been rendered"; (2) R.I.G.L. 1956 § 10-10-4, which states "No female shall be arrested on original writ in any action founded on contract"; (3) R.I.G.L. 1956 § 41-5.2-12, which states that "(a) Male mixed martial artists shall wear a groin protector of their own selection, of a type approved by the commissioner. (b) Female mixed martial artists are prohibited from wearing groin protectors. (c) Female mixed martial artists shall wear a chest protector during competition. The chest protector shall be subject to the approval of the commissioner"; (4) R.I.G.L. 1956 § 15-4-14, which states that "(a) In all actions, suits, and proceedings by or against a married woman, she shall sue and be sued alone. (b) In all actions for injuries to the person, a married woman may sue in her own name and may include in the suit a claim for medical and/or hospital and/or dental expenses incurred in her behalf either in her name or that of her husband. (c) If the husband pays any or all of his wife's bills, the party responsible for the injuries may reimburse him directly and will not be required to pay the bills again." *See* ECF No. 1, ¶ 6.

remedial action in the way the laws are executed, it implicates a power reserved exclusively to the Executive. R.I. Const. art. IX, § 1. Moreover, the powers of the Attorney General are generally subject to the discretion of the office – the opposite of ministerial duties. A ministerial duty is "one that is to be performed by an official in a prescribed manner based on a particular set of facts without regard to the exercise of his own judgment upon the propriety of the act being done." *Nerney v. Town of Smithfield*, 269 A.3d 753, 756 (R.I. 2022). Mandamus will not issue to compel a public officer to perform an act that she has the discretion to refuse. *City of Providence v. Estate of Tarro,* 973 A.2d 597, 604 (R.I. 2009).

Even when the Attorney General is charged with a responsibility under state law, he retains enormous discretion over the manner in which it carries out that authority. For example, the Attorney General performs a law enforcement and civil enforcement function, but the decision to prosecute and the manner of prosecution is entirely discretionary. *State v. Lead Indus. Ass'n, Inc.,* 951 A.2d 428, 475 (R.I 2008) ("wide discretion"). *See Livermore v. Att'y Gen. for State,* 703 A.2d 1120, 1121 (R.I. 1997) (the prosecutorial discretion of the Attorney General cannot be made subject to a writ of mandamus). The Attorney General is authorized to bring lawsuits, but the decision whether to do so lies at his election, as he or she is directed to institute legal actions when the office deems it "necessary." R.I.G.L. 1956 § 42-9-6.[13] The office

---

[13] A very few of the Attorney General's responsibilities are mandatory, but they have nothing to do with what the Trust asks the office to do here. *See e.g.*, R.I.G.L. 1956 § 9-31-8 ("shall, upon a written request of an employee or former employee of the state of Rhode Island, defend any action brought against the state employee or former state

13

rules on certain firearms applications, but approval lies in its discretion. *Mosby v. Devine,* 851 A.2d 1031, 1048 (R.I. 2004) (application to carry concealed weapon). These are but a handful of the duties the Attorney General performs, and none of them are appropriate for mandamus. *Accord, Elizabeth Cady Stanton Trust v. Nessel,* 2023 WL 3259399, at *4 (mandamus inappropriate where Attorney General retains discretion over when and how it carries out various duties); *James* at 12 ("plaintiff points to no authority burdening defendant with the mandatory responsibility to fix the state's broken laws.").

The authority that the Trust points to boils down to the oath of office that the Attorney General took to "support the Constitution of the United States . . . and [] faithfully discharge the duties of the Office of Attorney General . . ." (ECF No. 16, at 2-3.) The Trust argues that identifying and repairing laws to comply with the ERA is mandated by the obligation to "support" the Constitution. Setting aside the conclusory assumption implicit in this argument – that the ERA was validly ratified and thus *is* even a prescription to be complied with – the suggestion that the global oath to do justice translates into ministerial tasks that can be compelled through mandamus is either terribly naïve or a deliberate side-stepping of mandamus' strict requirements.

The Trust virtually admits that it cannot directly establish a clear right to require the Attorney General to take the action it wants him to take: "Plaintiff can

---

employee . . .." R.I.G.L. 1956 § 42-9-6.1 (mandatory annual report of defense of legislation).

cite no case law from Rhode Island or elsewhere holding that a specific state official is responsible for ensuring that a state's laws, policies and programs are compliant with a new Constitutional amendment, . . ..'' (ECF No. 9, at 11.) Instead, it simply pleads with the Court that "*some* state official must take *some* action and that the Defendant as chief law enforcement officer for Rhode Island, has *some* responsibility." *Id.* (emphasis original).[14] The Trust settles on the Attorney General as that official without providing any support for the proposition that he is even *able,* much less *obligated,* to act in the way the Trust suggests. Instead, the Trust simply asks "how could he not be?" (ECF No. 9, at 2.) Indeed, the Trust almost gives its position away by suggesting a fallback:

> Perhaps the Defendant is not the only government official responsible for bringing Rhode Island laws, policies, and programs into compliance with the ERA, but he cannot in good faith argue that he has no obligation whatsoever to at least issue some sort of advisory informing state officials and the general public that the ERA is now valid and that all laws, policies and programs must be brought into compliance.

(ECF No. 9, at 12.) In this alternative to *mandamus,* the Trust proposes that the Attorney General act as a modern-day Paul Revere, spreading the word that the ERA should be enforced.

However laudable the idea that the Attorney General should take it upon himself to turn Elizabeth Cady Stanton's admonition that "all men and women are

---

[14] The *James* opinion characterizes this statement, repeated in that case's briefing, as "plaintiff's inability to describe its exact parameters [which] means that it is neither clear nor ministerial." *James* at 12.

created equal" into reality, the Trust has failed to provide a foundation upon which the Court can play a role.

## IV. CONCLUSION

The United States Constitution provides a pathway for adding new Amendments, and Congress has determined that the last step on that path is certification and publication by the National Archivist. Whether the National Archivist should have done so, or should yet do so, is not properly before this Court. The Defendant's Motion to Dismiss (ECF No. 5) is GRANTED.

IT IS SO ORDERED:

_____
Mary S. McElroy,
United States District Judge

Date: September 8, 2023